**TMG LIFE INSURANCE CO., Relator–Petitioner,**

v.

**COUNTY OF GOODHUE, Respondent.**

No. C9–95–373.

Supreme Court of Minnesota.

Dec. 22, 1995.

John F. Bonner III, Minneapolis, for Relator-Petitioner.

Carol K. Lee, Assistant Goodhue County Attorney, Red Wing, for Respondent.

## OPINION

KEITH, Chief Justice.

This case, on certiorari from the Minnesota Tax Court, concerns the fair market value for

real estate tax purposes of the J.C. Penney Company, Inc. department store and adjacent land located in the Red Wing Mall in Goodhue County, Minnesota. On appeal, the owner of this property, TMG Life Insurance Co. ("TMG"), challenges the decision by the Minnesota Tax Court valuing the property at $740,600 for real estate taxes due and payable in 1994. *TMG Life Ins. Co. v. County of Goodhue,* File No. C9-94-479, 1994 WL 725485 (Minn.Tax Dec. 15, 1994). We affirm the tax court's decision.

I.

TMG is a North Dakota life insurance company based in Fargo, North Dakota. After a merger with another insurance company, TMG acquired a 1987 mortgage, promissory note, assignment of lease and guarantee from Red Wing Mall Associates for the department store and adjacent land at issue in this case. On February 25, 1994, the Goodhue County District Court issued default judgment in favor of TMG after Red Wing Mall Associates defaulted on the terms of the mortgage. The court determined that Red Wing Mall Associates owed TMG in excess of $440,000 in principal, interest and attorney fees. A public auction of the property was held on May 3, 1994. TMG submitted a successful bid of $156,000. TMG moved for an order from the district court confirming the sale, and Red Wing Mall Associates challenged TMG's winning bid, arguing that the bid was too low, and therefore lacked good faith. The district court confirmed the sale, finding that in light of TMG's appraisal of the property at $415,000 and the existence of over $200,000 in outstanding real estate taxes, the $156,000 bid "does not by itself suggest any lack of good faith."

Concurrent with the foreclosure proceedings, TMG commenced this action in the Minnesota Tax Court to reduce the Goodhue County Assessor's January 2, 1993 estimated market value for the property of $740,600. A one-day trial before the tax court was held on November 8, 1994. At trial, each party submitted an appraisal report by an expert witness. The county's appraiser determined that the "unencumbered, fee simple market value of the subject property as of 2 January 1993, is: $755,000." TMG's expert appraiser opined that the "estimated Market Value, effective February 28, 1994, is: $415,000." His appraisal of the property was originally prepared for TMG's use during the foreclosure sale in early 1994.

The portion of the Red Wing Mall now owned by TMG consists of two lots covering a total of 156,816 square feet. The J.C. Penney store was constructed in 1985-86 and is roughly 22,204 square feet in size; the remainder of the property consists of parking area. J.C. Penney entered into a 20-year lease agreement with the Red Wing Mall Associates in 1985, with the option to extend the lease for several additional 5-year periods. The lease provides for payment of $77,714 in base rent each year, plus a common area maintenance charge of $.35 per square foot of leased space. The base rent does not fluctuate over the term of the lease, including any extensions exercised by J.C. Penney. In addition to the base rent, J.C. Penney is required to pay a small percentage of its actual retail sales whenever sales exceed approximately $3.9 million per year, a figure that has not been reached to date. TMG must pay for certain maintenance costs and base year real estate taxes. After deducting costs and taxes from the yearly rent paid by J.C. Penney, TMG receives approximately $1.97 per square foot in "triple net" rent.

At trial, TMG's first witness was an employee of the court-appointed receiver for the J.C. Penney portion of the Red Wing Mall. He estimated the annual net operating income from the property to be $41,500. TMG's real estate appraiser then testified that he arrived at his $415,000 estimated market value for the property by capitalizing its annual net operating income ($41,500) at a rate of 10%. He also noted that he determined the market rent for the property to be $6.50 per square foot and calculated the actual rent paid under the lease to be $3.50 per square foot before taxes. His appraisal therefore described J.C. Penney's triple net rent as "*considerably* below current market levels." On cross-examination, TMG's expert stated that his estimate only reflected the value of the "leased fee interest" (TMG's interest as a landlord) and that the value of the "leasehold interest" (J.C. Penney's interest as a tenant) "doesn't come into play in the definition of market value."

Counsel for Goodhue County did not dispute TMG's estimation of the expenses and income generated by the property, but argued that the issue before the court was the proper way to interpret this information. The county assessor testified that his appraisal reflected the value of the unencumbered fee simple interest in the property, which included all rights and privileges pertaining to the land as required by Minn.Stat. § 272.03, subd. 1 (1994). The county assessor used a summary of leases for other tenants in the Red Wing Mall to estimate the market rent for retail stores in the area. He selected the other anchor store in the mall, K–Mart, as the best indication of market rent for an anchor department store like J.C. Penney. K–Mart's rent under its 1992 lease was $3.50 per square foot after deducting taxes and maintenance expenses, compared to J.C. Penney's rent of $1.97 per square foot triple net. Other smaller stores in the Red Wing Mall paid much higher rents than the two anchor stores, with an average of $5.63 per square foot triple net. The assessor testified that in light of these figures, he concluded that J.C. Penney's rent was substantially below market. Therefore, he selected $3.50 per square foot as the market rent for an anchor store like J.C. Penney. This rent produced a net operating income of $72,386 which he capitalized at a rate of 9.59% for a total estimated market value of $755,000.

In its decision, the tax court described the fundamental dispute between the parties as "what interest should be valued for tax purposes, the fee, or the leased fee interest." TMG's expert, the court found, considered only the owner's "leased fee interest" in reaching his estimated value of $415,000, instead of considering the entire fee simple interest in the property. The court concluded, however, that assessors are required to value the entire fee interest in the property, not the partial interests held by either owner or renter. In addition, the court agreed with the county that J.C. Penney's lease was at below-market rent, and that the assessor therefore must use market rents, rather than the actual rents, in valuing the property. Accordingly, the court affirmed the original estimated market value for the January 2, 1993 assessment, or $740,600, a figure slightly lower than the appraisal prepared by the county's expert for trial.

## II.

TMG's first contention is that the tax court erroneously admitted and considered the lease summary for another portion of the Red Wing Mall because TMG was not provided with a copy of the actual lease documents. After TMG's trial counsel received the county assessor's appraisal, he requested a copy of the lease summary relied upon by the assessor to determine the rents paid by other tenants in the mall. The tax court subsequently ordered Goodhue County to supply TMG with a copy of this lease summary. Then, the day before trial, TMG's trial counsel called the county attorney's office and asked for a copy of the K–Mart lease itself. However, neither the county attorney's office nor the county assessor had the actual lease in its possession. At trial, TMG made an oral motion in limine to prohibit reference to the K–Mart lease at trial, claiming that it needed a copy of the actual lease to effectively cross-examine the county assessor concerning his appraisal methods. The tax court denied the motion because the county assessor's opinion was based upon the rent information in the lease summary alone, which TMG had received, and because he saw no grounds for an objection to a document not within the county's files.

The decision whether to admit or exclude evidence rests with the trial court, and the ruling will not be disturbed absent indications of an erroneous legal view or abuse of discretion. *Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990). The Minnesota Rules of Evidence require that the contents of a writing be proven from the document itself, unless the document is lost, destroyed, or unavailable through any judicial procedure, or pertains to a collateral matter. Minn.R.Evid. 1002, 1004. Therefore, TMG asserts that proof of the rent paid by K–Mart under its lease requires admission of the lease itself. The Minnesota Rules of Evidence, however, are subject to modification by the Minnesota Tax Court "when in its opinion the best interests of the parties

involved may be thereby served or the determination of the cause expedited." Minn.R. 8600.0400 (1994). Accordingly, the Minnesota Tax Court has enacted a rule which permits the admission of oral testimony as evidence of "the contents of books, documents, records and other papers." Minn.R. 8600.0900 (1994). The decision to allow such testimony is in the discretion of the court. *Id.* Therefore, it appears that the "best evidence rule" cited by TMG is less restrictive in tax court proceedings.

This court has held that the production of lease summaries and other "back-up data" relied upon by a county assessor in estimating the market value of a property can be compelled by a discovery motion at trial. *Montgomery Ward & Co. v. County of Hennepin,* 450 N.W.2d 299, 307–08 (Minn. 1990). However, in *Montgomery Ward,* the information on relevant valuation data from comparable properties was available in the government's files and was actually relied upon by the assessor to compute fair market value. *Id.* at 308. In this case, the document used by the county to estimate market rents in the Red Wing Mall, the lease summary, was provided to TMG before trial. Furthermore, there is no indication that TMG could not have obtained information regarding the lease from the owner of the K–Mart property, or that the owner was unavailable to testify at trial. Because the county never obtained a copy of K–Mart's lease and therefore did not rely upon its specific provisions, we hold that the tax court's denial of TMG's motion in limine was not an abuse of discretion under the tax court's rules.

## III.

The central issue in this case is TMG's challenge to the county's estimated market value of its property. Specifically, TMG contends that the tax court erred when it affirmed the January 2, 1993 assessment of $740,600 and refused to adopt TMG's own estimate of $415,000. In reviewing a tax court's opinion, this court will not disturb the lower court's findings unless the decision is clearly erroneous. *Westling v. County of Mille Lacs,* 512 N.W.2d 863, 866 (Minn.1994). The county assessor's estimate of value is prima facie valid, and the taxpayer carries the burden of proving that the value is excessive. *Schleiff v. County of Freeborn,* 231 Minn. 389, 395–96, 43 N.W.2d 265, 269 (1950). This court will order reversal of the tax court's decision only if it is convinced that a mistake has been made, or that the evidence does not support the tax court's findings. *Harold Chevrolet, Inc. v. County of Hennepin,* 526 N.W.2d 54, 57–58 (Minn.1995).

Although there are three basic approaches to the determination of the market value of real estate, both expert appraisers in this case agreed that the income capitalization approach was the most credible means of valuing TMG's property. *See Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177, 178 (Minn.1994); *Crossroads Center (Rochester), Inc. v. Commissioner of Tax.,* 286 Minn. 440, 446–47, 176 N.W.2d 530, 535 (1970). Due to a lack of comparable sales of small shopping centers in the area, these experts placed little weight on values obtained with the sales approach. And while both appraisers had some confidence in the cost approach, their estimates of market value using this method were significantly higher than the estimates using the income approach. In any event, the tax court regarded the income approach as the proper method, and TMG does not challenge that decision on appeal. *See Montgomery Ward,* 450 N.W.2d at 308 (income approach should receive overriding weight due to inherent weaknesses of other methods in valuing department store).

The income approach estimates market value by determining the net operating income attributable to the property, which is then divided by a capitalization rate to obtain the price an informed investor would theoretically pay for the property. *Montgomery Ward,* 450 N.W.2d at 303. For most retail stores, income from the property is generally earned through rental payments. *Id.* Both expert appraisers in this case used similar capitalization rates (9.59% by the county assessor, 10% by TMG's appraiser) to calculate the estimated market value; TMG does not quarrel with these figures on appeal.

■ TMG argues that the tax court erred by considering market rent in its valuation of the J.C. Penney store instead of the actual rent paid. The tax court stated in its decision that the property "is being leased to the J.C. Penney Company for less than market rents. * * * The assessor and this Court must value the property by assuming normal market rents and must ignore the actual rents under the lease unless they happen to correspond with market rents." We agree with the tax court's opinion, and reject TMG's assertion that only the actual rent paid under a below-market lease is to be used to calculate the fair market value of income-producing property.

In *Crossroads,* we recognized that "an unprofitable lease should not be used to determine value for property tax purposes. Rather, the fair rental value should be used." 286 Minn. at 447, 176 N.W.2d at 535. In that case, the owner of a retail store occupied by a Sears department store challenged the county assessor's estimation of market value for real estate tax purposes. Sears had a 25-year lease and paid rent equal to 2.5% of its net retail sales. *Id.* at 446, 176 N.W.2d at 535. Like the J.C. Penney store in this case, the Sears store's yearly rent fell below market rates for similar stores. The owner claimed that the unprofitable lease decreased the fair market value of the property. This court rejected that argument, and upheld the tax court's adoption of the assessor's higher figures. *Id.* at 448, 176 N.W.2d at 536. *See In re McCannel,* 301 N.W.2d 910, 923 (Minn. 1980) (income approach requires estimation of "the income the property will produce or could produce in its present condition, and possibly the income that it would produce if changed"). *See also* Jennifer J.S. Brooks & Ronald J. Schultz, *Market Theory: An Approach to Real Estate Property Valuation for State and Local Tax Purposes,* 45 Tax Law. 339, 376 (Winter 1992) (majority of states use market rents to calculate value of income-producing property).

We see no reason to depart from our holdings in *Crossroads* and *McCannel.* The tax court's determination that J.C. Penney was paying below-market rent is a fact question, which this court will not disturb "where the evidence, as a whole, supports the decision." *Manthey v. Commissioner of Revenue,* 468 N.W.2d 548, 550 (Minn.1991). In this case, both TMG's expert and the county assessor agreed that J.C. Penney was paying below-market rent on a long-term lease. Therefore, the county assessor used the higher rent paid by another anchor store in the same mall to estimate the market rate. The tax court adopted the county's assessment of $740,600, noting that K–Mart entered into its lease more recently than J.C. Penney, in 1992. In light of established caselaw and the evidence supporting the county's appraisal, we find that the tax court's decision was not an abuse of discretion.

### IV.

TMG's final assertion is that the tax court should have adopted its $415,000 valuation because the Goodhue County District Court allegedly considered that figure the correct value of the property during the foreclosure proceedings. This argument is without merit. The district court that confirmed TMG's $156,000 bid at the foreclosure sale did not state that TMG's appraisal was the true market value of the property. The court instead found that the bid "does not by itself suggest any lack of good faith" and was not "unconscionably low."

■ More to the point, the tax court is required by statute to "hear, consider, and determine without a jury every appeal de novo." Minn.Stat. § 271.06, subd. 6 (1994). *See Red Owl Stores, Inc. v. Commissioner of Tax.,* 264 Minn. 1, 5, 117 N.W.2d 401, 405 (Minn.1962) (appeals from order of commissioner of revenue are to be tried de novo). Furthermore, tax assessors are required to value all property at its market value. Minn. Stat. § 273.11, subd. 1 (1994). Market value is expressly defined as the price "which could be obtained at a private sale or an auction sale * * *. *The price obtained at a forced sale shall not be considered."* Minn.Stat. § 272.03, subd. 8 (1994) (emphasis added). Therefore, the tax court correctly rejected TMG's valuation of the property from the foreclosure sale appraisal.

Affirmed.